UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT WILLIAMSON,

    Plaintiff,

v.

BASF CORPORATION,

    Defendant.

                               /

Case No. 05-74861

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [9]**

This state-law sexual harassment and retaliation action comes before the Court on Defendant BASF Corporation ("BASF")'s motion for summary judgment. For the reasons stated below, Defendant's motion is GRANTED.

**I.   Facts**

BASF is a chemical manufacturing company with facilities in Wyandotte, Michigan. Plaintiff was hired by BASF in 1997 and terminated on September 15, 2005, for inappropriate conduct. (McNeil Dep. at 15.) Plaintiff was told that he was being fired because he had disobeyed company policy. (Pl.'s Dep. at 15.)

At the time of his termination, Plaintiff was 28-years old and a senior technician in BASF's "eslasto-cell" or "cellasto" department in Wyandotte, which makes polyurethane for automotive parts. (Pl.'s Dep. at 5-6.) His job duties included running mold lines and operating a deburrer machine. (*Id.* at 6.) Plaintiff's friend since elementary school, Mike Fivecoat, and Mr. Fivecoat's wife, Julie Fivecoat, also worked at the BASF Wyandotte plant

at this time and often during the same shifts. (Pl.'s Dep. at 19, 23, 34.) Mrs. Fivecoat was employed by Adecco Employment Services, a staffing company, and was a contract worker at BASF. (Julie Fivecoat Dep. at 5-6.) At BASF, her job duties included visual inspection of parts. (Pl.'s Dep. at 19.) Mr. Fivecoat was a senior technician like Plaintiff.

The events giving rise to Plaintiff's claims occurred in late July, August, and September 2005, and involve sexual contact between Mrs. Fivecoat and another BASF employee, George Petrowski, as well as sexual contact between Mrs. Fivecoat and Plaintiff. Plaintiff's version of the facts are as follows.

### A. Plaintiff's Testimony

Shortly before July 22, 2005, Plaintiff observed Mrs. Fivecoat masturbating George Petrowski in the BASF import warehouse. (Pl.'s Dep. at 16, 20, 62.) He waited until the next day and then reported it to his production supervisor, Mike Makuch. (Pl.'s Dep. at 20-21.) Makuch told him to shut his mouth and forget what he saw and expressed concern that Mrs. Fivecoat's husband would find out about it. (*Id.* at 21.) Plaintiff did not tell anyone else about this incident because he too was concerned that Mr. Fivecoat would hear about it. (*Id.* at 21-23.)

On July 22, 2005, Plaintiff observed Mrs. Fivecoat performing oral sex on Mr. Petrowski in the warehouse office during the midnight shift. They were aware that Plaintiff saw them, but no one exchanged words at that time. (Pl.'s Dep. at 23-26.)

On July 25, 2005, Plaintiff reported what he saw to his production supervisor, Mike Makuch. (Pl.'s Dep. at 29.) Mr. Makuch once again told him to forget what he saw, expressing concern about Mr. Fivecoat's reaction if he learned about it. (Pl.'s Dep. at 27-28.)

Between July 25 and July 30, 2005, Plaintiff testified that Mrs. Fivecoat came up to him while he was at work, gave him a kiss on the cheek, and said "thanks" for not telling her husband about what he saw. (Pl.'s Dep. at 32-33.) Also during that time, Plaintiff testified that Mrs. Fivecoat came up to him at work, grabbed his crotch and bragged that she was good at oral sex. Plaintiff believed that Mrs. Fivecoat did this because she was afraid he would tell her husband what he had observed. (Pl.'s Dep. at 33-35, 74.) Plaintiff immediately told Mike Makuch about these incidents. Mr. Makuch told him to work up front, to stay away from Mrs. Fivecoat, and not to work in the area where he would have contact with Mrs. Fivecoat. (Pl.'s Dep. at 35-36.) Mr. Makuch also told Plaintiff that he was going on vacation, that he would investigate it further upon his return, gave Plaintiff his phone number, and told him to contact him if anything happened while he was on vacation. (Pl.'s Dep. at 28-29.) Mr. Makuch then went on vacation for two weeks.

On August 1, 2005, Mrs. Fivecoat approached Plaintiff outside of work at a bar. Plaintiff was there with other BASF employees. Mrs. Fivecoat knew that her husband and Plaintiff usually played darts on Saturday, and she told Plaintiff that she was concerned that he would tell her husband about her and George. While doing so, she touched his legs, rubbed him, and offered to have oral sex or intercourse with him so he wouldn't tell her husband. Plaintiff told her that he would not tell her husband and to "quit it." (Pl.'s Dep. at 38-39.) Plaintiff left the bar when her husband called her.

During the week of August 1, 2005, Mrs. Fivecoat called Plaintiff on his cell phone, leaving several sexual messages, but he did not return the calls. (Pl.'s Dep. at 40-41.) Mrs. Fivecoat also went to Plaintiff's home on two occasions. One time, she told him that she was nervous and wanted to make sure Plaintiff did not tell her husband about the

3

incident with George Petrowski. (Pl.'s Dep. at 43-44.) Another time, she was on her way to a wedding, told him that she did not have any underwear on and asked if she could come by after the wedding. Plaintiff told her "no." (Pl.'s Dep. at 50.) During this time, Mrs. Fivecoat did not approach Plaintiff at work. (Pl.'s Dep. at 50.)

On August 11, 2005, Plaintiff testified that, because Mr. Makuch was on vacation, he went to his shift leader, Brian Massey, and told him that Mrs. Fivecoat was "coming on to him," and Mr. Massey told him to let Mr. Makuch deal with it. (Pl.'s Dep. at 42.)

Plaintiff did not call Mr. Makuch while he was on vacation. On August 14, 2005, Mr. Makuch called Plaintiff to check on the situation at work. Plaintiff told Makuch that Mrs. Fivecoat had not approached him but appeared nervous because Plaintiff was avoiding her. (Pl.'s Dep. at 36-37.) Makuch told Plaintiff to "keep his zipper up." (Pl.'s Dep. at 36, 49.)

On August 20, 2005, Plaintiff and Mr. Fivecoat were at a bar when Mr. Fivecoat got a call from his wife. Mr. Fivecoat told Plaintiff that his wife told him that she wanted to leave him and that he wanted to go home. He also told Plaintiff that he knew his wife was cheating on him with a someone at work named "Ryan." Plaintiff told Mr. Fivecoat that it wasn't Ryan and that he should talk to his wife. Mr. Fivecoat angrily told Plaintiff that he had better tell him if he knew something. (Pl.'s Dep. at 51-53.)

On August 22, 2005, Plaintiff saw Mr. Fivecoat at work. Mr. Fivecoat told Plaintiff again that he better tell him if he knew something and began running through a list of coworker names. When he came to George Petrowski's name, Plaintiff put his hand up and said, "Hey, you, you know, ask your wife." (Pl.'s Dep. at 54.) Mr. Fivecoat inferred that this meant it was George Petrowski, and stormed out of the area. About five minutes later,

4

Mr. Makuch came in and asked Plaintiff why he told Mr. Fivecoat about his wife's relationship with George Petrowski.  Plaintiff replied that he may have said it indirectly, but did not say it directly.  (Pl.'s Dep. at 54-55.)

The next day when Plaintiff approached Mr. Fivecoat, he refused to talk to Plaintiff, saying "I'm done talking.  I don't want to talk about it anymore." (Pl.'s Dep. at 57.)  For about the next week or so, Mrs. Fivecoat was not at work, and Plaintiff assumed that she had been fired.  (Pl.'s Dep. at 57.)

Between August 29 and September 13, 2005, Plaintiff recalled that Mrs. Fivecoat returned to work on the day shift.  (Pl.'s Dep. at 58-59.)  Plaintiff continued to work with Mr. Fivecoat, neither of them discussing the sexual relationship between his wife and George Petrowski.  (Pl.'s Dep. at 59.)

On September 13, 2005 at 2:30 a.m., Plaintiff, who was working midnights, was called to a BASF conference room by BASF's human resources manager, Kyrus McNeil.  (Pl.'s Dep. at 59-60.)  Another BASF employee was present, and both asked him what he knew about the relationship between Mrs. Fivecoat and George Petrowski.  He told them about both incidents he witnessed between the two.

Plaintiff also told them about the times Mrs. Fivecoat kissed him on the cheek and grabbed his crotch while he was at work.  Plaintiff did not tell the BASF human resources manager or other BASF employee that he had reported any of this to Mr. Makuch.  (Pl.'s Dep. at 63.)  Mr. McNeil then told Plaintiff that BASF had been investigating allegations of improper sexual conduct at work for the past two weeks, that they were going to keep Plaintiff away from Mrs. Fivecoat so that there were no further instances, that Plaintiff would

be suspended with pay until they sorted out all their information, and that they would contact Plaintiff within two days. (Pl.'s Dep. at 63-64.)

On September 15, 2005, Plaintiff was called and told that he was terminated. (Pl.'s Dep. at 63-64.) The next day, Plaintiff testified that shift leader Massey called him and told Plaintiff that he had heard that Plaintiff was fired after admitting to having a sexual relationship with Mrs. Fivecoat. Plaintiff denied that this was true. (Pl.'s Dep. at 64.) At his deposition, Plaintiff testified that he and Mrs. Fivecoat were just friends, denied ever having any sexual relationship with her either in or outside the workplace, and denied that he ever told anyone otherwise. Plaintiff did admit, however, that he had told McNeil and DeLoach that he and Mrs. Fivecoat "had relations." He explained that what he meant was that they were "just friends," and expressed concern that McNeil and DeLoach may have misinterpreted his statement. (Pl.'s Dep. at 65-66.)

Testimony from other BASF employees describe BASF's investigation that led to Plaintiff's termination.

### B.  BASF Investigation of Alleged Sexual Harassment

The BASF investigation of the alleged sexual relationship between Mrs. Fivecoat and George Petrowski began with a flurry of activity. Mr. Makuch testified that it was near the end of the work day when Mr. Fivecoat approached him and told him that he had heard that George and his wife might be messing around at work. (Makuch Dep. at 18-19.) Mr. Makuch immediately informed the plant manager, Mr. Easley. (*Id.* at 19.) That was August 29, 2005.

On August 30, 2005, Mr. McNeil received a call from David Easley informing him that he had a sexual harassment issue. The previous day, August 29th at about 3:00 p.m., Mr.

Fivecoat had informed Easley that his wife, who worked midnights as an Adecco contract inspector, had a relationship with another BASF employee, George Petrowski, that was originally consensual but had become nonconsensual. Mr. Fivecoat admitted that his relationship with his wife was rocky, that he had heard rumors about her being unfaithful, and that she did not deny a relationship with George Petrowski when he confronted her about it. He also confirmed to Mr. Easley that he could continue working without causing an incident or any disruption. (McNeil Dep. at 17-19; Def.'s Ex. E, McNeil 8/30/05 memo.)

On August 30, 2005, Mr. McNeil's H.R. assistant also received an email from Mrs. Fivecoat's employer, Adecco, asking whether there was an ongoing sexual harassment investigation at BASF regarding Mrs. Fivecoat. (McNeil Dep. at 20-21, 26-27.) Mrs. Fivecoat testified at her deposition that she became aware of the investigation into her sexual relationship with George Petrowski when her husband came home from work and told her BASF was conducting one. (J. Fivecoat Dep. at 17.) She then notified her employer of the BASF investigation. She denied that she was ever harassed by George Petrowski or ever said that she was and admitted having a consensual sexual relationship with him. (*Id.* at 18-22.)[1]

After speaking with Mr. Easley, Mr. McNeil consulted with various BASF supervisors. Because Mrs. Fivecoat had not filed a formal complaint, Mr. McNeil sought to obtain a better understanding of what was happening by conducting informal interviews. (McNeil Dep. at 19-20, 29.) He also informed Mr. DeLoach, E.E.O. at BASF of the situation, and

---

[1] Mrs. Fivecoat also admitted, in her deposition, that she had a consensual sexual relationship with Plaintiff and that sexual contact took place both in and outside the workplace. (J. Fivecoat Dep. at 5-7.)

Mr. DeLoach subsequently flew to Wyandotte, Michigan to assist Mr. McNeil in his formal investigation of any sexual harassment of Mrs. Fivecoat by Mr. Petrowski. (McNeil Dep. at 23, 28-35; DeLoach Dep. at 10.)

Beginning August 30, 2005 and continuing through September 13, 2005, numerous BASF employees, including Plaintiff, George Petrowski, and Mr. Fivecoat, were interviewed as was contract employee Mrs. Fivecoat. All were asked about the allegations of a sexual relationship between Mrs. Fivecoat and George Petrowski. (McNeil Dep. at 37, 40-41.) Somewhere between August 30 and September 7, 2005, Mr. McNeil obtained information that there had also been consensual sexual contact both on and off the job site between Plaintiff and Mrs. Fivecoat, including Plaintiff's statement that he had a "flirtatious" "off site" relationship with Mrs. Fivecoat. (McNeil Dep. at 38, 47-55, 65-67.) Additional information about Plaintiff's sexual relationship with Mrs. Fivecoat was obtained in interviews jointly conducted by Messrs. McNeil and DeLoach. According to McNeil and DeLoach, Plaintiff told them that he and Mrs. Fivecoat had kissed and groped at work. (McNeil Dep. at 68-70.) Plaintiff did not tell them that Mrs. Fivecoat was the aggressor or that he had reported this conduct to Mr. Makuch or Mr. Massey, and it was inferred that this contact was consensual. (McNeil Dep. at 69-70; DeLoach Dep. at 32-33, 35.)

Mr. Makuch testified at his deposition that Plaintiff never reported to him that he had observed any sexual contact between Mrs. Fivecoat and George Petrowski at the BASF plant. Rather, Plaintiff told him that George was "very friendly" with Mrs. Fivecoat, rubbing her back at times, and that they spent a lot of time together. (Makuch Dep. at 9, 12-13.) Mr. Makuch further testified that Plaintiff did not tell him that Mrs. Fivecoat had grabbed his crotch or was "touchy-feely" with him, that he never told Plaintiff to stay away from her while

8

at work, and that he had not heard rumors about a sexual relationship between the two until after BASF's investigation of Mrs. Fivecoat's relationship with George Petrowski. (Makuch Dep. at 9, 13, 15-17, 23.)

Mr. Massey, Plaintiff's frequent shift leader during this period, similarly testified that he first learned of rumors about a sexual relationship between George Petrowski and Mrs. Fivecoat at BASF from Plaintiff after Labor Day in September 2005. Massey further testified that Plaintiff, in that same conversation, also told him that their immediate supervisor, Mr. Makuch, knew about it, and that Plaintiff did not ask Massey to do anything with regard to the rumors. (Massey Dep. at 13-17.) A day or two after Labor Day, Massey's supervisor, Mr. Pellow, called Massey into his office. When asked what he knew about a sexual relationship between Mrs. Fivecoat and George Petrowski, Massey repeated what Plaintiff had just told him. (Massey Dep. 21-24.) Massey learned that Mr. McNeil in H.R. was gathering witnesses, taking statements, and would be in touch with him. (Massey Dep. at 24.) Massey was subsequently interviewed by McNeil. It was after BASF's investigation was under way and after his meetings with Pellow, McNeil, and DeLoach that Plaintiff told Massey that Mrs. Fivecoat had exposed her pubic area to him at work and that he had had sex with her in her home. (Massey Dep. at 27-32, 36-37, 41-42.)

In her interview with McNeil and DeLoach, Mrs. Fivecoat was asked about her sexual contact with George Petrowski at work, but was not asked about any such contact with Plaintiff. In response to an open-ended question about any other similar activity, Mrs. Fivecoat denied that there was any. (McNeil Dep. at 45-47.) At her deposition, however, Mrs. Fivecoat admitted that over the two to three week period in August 2005, she and

9

Plaintiff had consensual sexual intercourse three times; one time on BASF property, one time in her home, and one time at his house. (J. Fivecoat Dep. at 5-6.) She testified that, although she rejected Plaintiff and felt harassed at first, she changed her mind and consented to the sex. She ended the relationship in late August or early September 2005 about a day or two before the BASF investigation began. (*Id.* at 7-16.)

### C. Termination Decision

As a result of BASF's investigation, Plaintiff was fired for inappropriate conduct; specifically, having inappropriate consensual physical contact at the workplace with Mrs. Fivecoat, a contract worker at BASF and the spouse of another employee. (McNeil Dep. at 15-17, 21-23.) BASF's human resources manager, Kyrus McNeil, made the decision to terminate Plaintiff along with the E.E.O. Manager, Roland DeLoach, and David Easley, the BASF Wyandotte plant manager. Plaintiff's immediate supervisor, Manufacturing Supervisor Mike Makuch, and Makuch's boss, Mark Pellow, were also consulted. The decision was also reviewed by BASF's Director, John Sullivan, its Business Director, Robert Jamrog, and its Vice President, William Bernstein, before Plaintiff was informed. (McNeil Dep. at 8-14.)

As a result of BASF's investigation, BASF employee George Petrowski was also terminated, and Mrs. Fivecoat's employer, Adecco, was asked to and did remove her from the BASF facility. (DeLoach Dep. at 36.)

### D. Plaintiff's Lawsuit

On November 23, 2005, Plaintiff filed a complaint in state court alleging that BASF violated Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2101, *et seq.*, when (1) it failed to take prompt remedial action in response to Plaintiff's

complaints to BASF management of sexual harassment by Mrs. Fivecoat thus creating a hostile work environment, and (2) it retaliated against him for making such complaints and fired him.  (Def.'s Ex. M, Pl.'s Compl.)  Establishing that diversity jurisdiction exists, BASF removed the action to this Court.  The matter is presently before the Court on BASF's motion for summary judgment.

## II.   Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The mere existence of a scintilla of evidence in support of the non-moving party's position

will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

### III. Analysis

#### A. Hostile Environment - Sexual Harassment Claim

##### 1. Legal Principles

Michigan's ELCRA prohibits employers from discriminating against employees because of sex. The Michigan Courts recognize that "discrimination because of sex includes sexual harassment." *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 915 (Mich. 2000). Sexual harassment addressed under the ELCRA includes both quid pro quo harassment and hostile environment harassment. *Id.* Hostile environment harassment is at issue here. It is defined in the statute as "conduct or communication" that "has the purpose or effect of substantially interfering with an individual's employment. . . ." *Id.* (quoting Mich. Comp. Laws § 37.2103(i)).

To establish his claim of hostile environment sexual harassment, Plaintiff must prove the following:

> (1) the employee belonged to a protected group;
> (2) the employee was subjected to communication or conduct on the basis of sex;
> (3) the employee was subjected to unwelcome sexual conduct or communication;
> (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and
> (5) respondeat superior.

*Id.* (quoting *Radtke v. Everett*, 501 N.W.2d 155, 162 (Mich. 1993)). It is the fourth and fifth elements that are at issue here.

As to the fourth element, the Michigan Supreme Court has held that "whether a hostile work environment existed shall be determined by whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Radtke*, 501 N.W.2d at 167. Quoting, with approval, a decision by the United States Supreme Court, the Michigan Supreme Court further observed that:

> "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Quinto v. Cross and Peters Co.*, 547 N.W.2d 314, 323 (Mich. 1996) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22-23 (1993)).

The Court in *Radtke* further observed that, "[a]lthough rare, single incidents *may* create a hostile environment -- rape and violent sexual assault are two possible scenarios. . . . Because a single incident, unless extreme, will not create an offensive, hostile or intimidating work environment, a plaintiff usually must prove that (1) the employer failed to rectify a problem after adequate notice, and (2) a continuous or periodic problem existed or a reception of an episode was likely to occur." *Id.* at 168. This discussion invokes the fifth element that a plaintiff must establish to succeed on a claim of hostile environment sexual harassment; i.e., respondeat superior, or fault on the part of the employer.

### 2. Coworker's Alleged Sexual Harassment Was Not Severe or Pervasive

Accepting Plaintiff's version of the facts as true, this Court concludes that Plaintiff cannot establish the fourth element of his *prima facie* case; i.e., that he was subjected to a hostile work environment. Applying the required objective reasonableness test and considering the totality of circumstances, this Court examines the conduct that Plaintiff argues gives rise to his hostile environment - sexual harassment claim: (1) the two incidents involving apparently consensual conduct between Mrs. Fivecoat and another coworker, George Petrowski, that Plaintiff inadvertently observed from a distance at the workplace; (2) the time, between July 25 and July 30, 2005, when Mrs. Fivecoat came up to Plaintiff at work, gave him a kiss on the cheek and thanked him for not telling her husband that she had oral sex with Mr. Petrowski; (3) the time, also between July 25 and July 30, 2005, when Mrs. Fivecoat came up to Plaintiff at work, grabbed his crotch, and bragged about how well she performed oral sex; and (4) the times, between August 1 and 11, 2005, that Mrs. Fivecoat made advances toward Plaintiff outside of the workplace; e.g., approaching him at a bar, at his home, and leaving messages on his cell phone.

Considering the frequency, severity, presence or absence of physical threats or humiliating behavior, whether merely offensive utterances were involved, and whether the objectionable conduct interfered with Plaintiff's work, this Court concludes that the alleged sexual harassment of Plaintiff by his coworker, Mrs. Fivecoat, was not severe or pervasive and thus failed to create a hostile working environment. *See Quinto*, 547 N.W.2d at 323. First, as to Plaintiff's observation of sexual conduct between Mrs. Fivecoat and another coworker, George Petrowski, it is not disputed that this conduct was not aimed at Plaintiff. Accordingly, "that fact can be relied upon as part of a court's conclusion that a defendant's

14

conduct was not severe enough to create an objectively hostile environment." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000).

Second, as to Mrs. Fivecoat's conduct that occurred outside the workplace, the Michigan Court of Appeals observes that "[o]ff work, off-premises conduct by a coworker cannot fairly be attributed to the employer, nor can it fairly be said to be the 'fault' of the employer." *Parker v. Plastipak Packaging, Inc.*, No. 262247, 2006 WL 2956302, *3 (Mich. Ct. App. Oct. 17, 2006). Plaintiff cites no authority to the contrary. Likewise, Plaintiff presents no evidence that the objectionable conduct interfered with his work. In fact, Plaintiff testified that when Mr. Makuch called him during the time period these incidents took place, he told Makuch that Mrs. Fivecoat had not approached him at work but appeared nervous because Plaintiff was avoiding her. (Pl.'s Dep. at 36-37.)

Third, as to the two incidents that did occur at the workplace and involved Mrs. Fivecoat's conduct toward Plaintiff, these cannot be objectively viewed as physically threatening, frequent, severe, or substantially interfering with Plaintiff's work performance. Although they involved touching and sexual utterances, these incidents cannot be objectively described as being physically threatening or severe.

Finally, Plaintiff failed to present any evidence that these incidents caused him to miss work or otherwise interfered with his work performance. Accordingly Plaintiff cannot establish the fourth element of his *prima facie* case for sexual harassment.[2]

---

[2] Even if Plaintiff could establish the fourth element of his *prima facie* case, this Court further concludes that he cannot establish the fifth.

As emphasized by the Michigan Supreme Court, "in cases involving a hostile work environment, a plaintiff must show some *fault* on the part of the employer." *Chambers*, 614 N.W.2d at 916. Thus, a violation of Michigan's ELCRA for creating a hostile work

### B. Retaliation Claim

Plaintiff also claims that BASF violated Michigan's ELCRA by retaliating against him for reporting Mrs. Fivecoat's sexual harassment. Michigan's ELCRA prohibits retaliation against a person who has made an ELCRA charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding or hearing under the Act. Mich. Comp. Laws § 37.2701(a).

The same burden-shifting analysis that applies to employment discrimination claims under the ELCRA also applies to retaliatory discharge claims under that Act. *Barrett v. Kirtland Comm. College*, 628 N.W.2d 63, 69-70 (Mich. Ct. App. 2001). The plaintiff bears the initial burden of establishing a *prima facie* case of retaliatory discharge. Once the plaintiff does that, the burden shifts to the defendant to articulate a legitimate business

---

environment "can only be attributed to the employer if the employer failed to take prompt and adequate remedial action after having been reasonably put on notice of the harassment." *Id.* (citing *Radtke*, 501 N.W.2d at 168). The Court further clarified that "notice of sexual harassment is adequate if, by an objective standard, the totality of circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Id.* at 919. Finally, it emphasized that "the relevant inquiry concerning the adequacy of the employer's remedial action is whether the action reasonably served to prevent future harassment of the plaintiff." *Id.*

Accepting Plaintiff's version of the facts as true, it cannot be said that BASF failed to take prompt and adequate remedial action after having been reasonably put on notice of the alleged sexual harassment of Plaintiff by Mrs. Fivecoat. In response to Plaintiff's notice to Mr. Makuch of Mrs. Fivecoat's inappropriate sexually harassing conduct, Mr. Makuch immediately advised Plaintiff to limit his job duties to an area of the plant where Mrs. Fivecoat did not work. He further instructed Plaintiff to contact him if anything happened while he was on vacation. Even though Plaintiff did not contact him, Mr. Makuch called to follow-up on the situation. When he did so, Plaintiff reassured him that Mrs. Fivecoat had not approached him but appeared nervous because Plaintiff was avoiding her. Under Plaintiff's version of the facts, the action taken by his immediate supervisor reasonably served to prevent any future harassment by Mrs. Fivecoat.

16

reason for the discharge. If the defendant does that, the burden shifts back to the plaintiff to produce evidence showing that the defendant's proffered reason is a mere pretext for unlawful retaliation. *Roulston v. Tendercare (Michigan), Inc.*, 608 N.W.2d 525, 530 (Mich. Ct. App. 2000).

BASF argues here that Plaintiff's retaliation claim must be dismissed because it has presented undisputed evidence showing that it had a legitimate, non-retaliatory business reason for Plaintiff's termination; i.e., his inappropriate sexual contact at work with Mrs. Fivecoat. Plaintiff does not dispute this. Rather, Plaintiff responds by arguing that the articulated reason is a mere pretext for improper retaliation against him for previously reporting Mrs. Fivecoat's improper sexual contact with both George Petrowski and him. Specifically, Plaintiff argues that BASF's articulated business reason for his termination is pretext "not because it may be false, but rather because it is wholly disingenuous." (Pl.'s Resp. at 11.) The articulated business reason is disingenuous, Plaintiff argues, because it is based entirely on "the hearsay allegations of other employees." (*Id.*) Those allegations should have been "treated with a high degree of suspicion," Plaintiff asserts, because it is his subjective belief that they were motivated by his coworkers' desire to see him punished for telling Mr. Fivecoat about his wife's unfaithfulness with George Petrowski. (*Id.*)

BASF's human resource manager, Kyrus McNeil, and BASF's E.E.O, Ronald DeLoach, testified that several of Plaintiff's coworkers told them that they had heard about a consensual sexual relationship between Mrs. Fivecoat and Plaintiff both inside and outside the workplace. (McNeil Dep. at 47-65; DeLoach Dep. at 29.) One coworker told them that she saw Plaintiff kissing Mrs. Fivecoat at work. (McNeil Dep. at 53.) They also testified that in their interview with Plaintiff, he did not deny that had a flirtatious relationship

with Mrs. Fivecoat outside of the workplace and admitted that they kissed and groped one time at work "between the racks." (McNeil Dep. at 65-70; DeLoach at 32-33.) At his deposition, Plaintiff denied he ever had a sexual relationship with Mrs. Fivecoat. He admitted, however, that he had told McNeil and DeLoach during their investigation that he and Mrs. Fivecoat "had relations." He explained that what he meant was that they were "just friends" and expressed concern that McNeil and DeLoach may have misinterpreted his statement. (Pl.'s Dep. at 65.)

Because BASF satisfied its burden of showing that it had a legitimate, non-retaliatory reason for Plaintiff's termination, the burden of production returns to Plaintiff. Plaintiff is required "to show the existence of evidence sufficient to permit a reasonable trier of fact to conclude that [retaliation] was a motivating factor for the adverse action taken by" his employer. *Hazel v. Ford Motor Co.*, 628 N.W.2d 515, 526 (Mich. 2001) (internal quotation and citation omitted). Plaintiff attempts to show pretext not by showing that BASF's proffered reason had no basis in fact. Rather, he questions the wisdom of BASF basing a termination decision solely on hearsay and rumors spoken by his coworkers who he subjectively believes were motivated by their desire to see him punished for telling Mr. Fivecoat about his wife's unfaithfulness with George Petrowski. (Pl.'s Resp. at 11.) Plaintiff's attempt to show pretext fails.

As observed by the Michigan Supreme Court, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or compliant." *Hazel*, 628 N.W.2d at 527 (internal quotes and citation omitted). Likewise, Plaintiff cannot show pretext merely with his subjective belief that

18

BASF's termination decision was based on an investigation that failed to adequately discount allegations by coworkers who were biased against him. Plaintiff simply has not shown that BASF's decision to terminate Plaintiff was "so ridden with error that defendant could not honestly have relied on it." *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (internal quotes and citation omitted). Accordingly, his retaliation claim under Michigan's ELCRA is dismissed.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED, and Plaintiff's claims are dismissed.


        s/Nancy G. Edmunds
        Nancy G. Edmunds
        United States District Judge

Dated: January 19, 2007

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 19, 2007, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer
        Case Manager